**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **JULIUS C. ADAMS, et al.,** | : | |
| Plaintiffs | : | |
| and | : | 5:63-CV-1926 (WDO) |
| **MICHAEL E. GARRETT, et al.,** | : | |
| Plaintiffs-Intervenors | : | |
| v. | : | |
| **THE BOARD OF PUBLIC EDUCATION OF BIBB COUNTY, GEORGIA, et al.,** | : | |
| Defendants | : | |

**ORDER**

This school desegregation lawsuit was originally filed in 1963 on behalf of African-American parents, their children and all similarly situated adults and minors seeking to prevent the Board of Public Education of Bibb County (the "School District") from operating a "dual system" of education, based wholly on segregating students by race. Throughout the 1960s and 1970s, the Court entered various orders designed to desegregate the School District and convert it to a unitary system. These orders required the School District to implement various remedies, including redrawing attendance zone lines, addressing disparities among the District's physical facilities and establishing a Majority-to-Minority ("M-to-M") transfer program. On September 5, 1978, the parties

1

consented to a settlement agreement which created a desegregation plan for the schools.

The United States Supreme Court intended federal supervision of local school districts to be a temporary measure. Lockett v. Board of Educ. of Muscogee County School Dist., 111 F.3d 839, 842 (11th Cir. 1997) (Lockett II)(citations omitted). "Since the legal justification for such supervision is a constitutional violation by local authorities, a district court must divest itself of jurisdiction when the constitutional violation has ceased and when local authorities have operated in compliance with a desegregation decree for a reasonable period of time." Id. (citing Freeman v. Pitts, 503 U.S. 467, 489, 112 S. Ct. 1430, 1445, 118 L. Ed.2d 108 (1992) ("The ultimate objective is to return school districts to the control of local authorities.")). Accordingly, on March 21, 2006, after nearly thirty years of litigation and implementation of desegregation plans, this Court announced its intention to consider whether the School District had achieved unitary status and whether it should dissolve the Consent Decree. The parties were instructed to declare their respective positions on unitary status and the termination of this Court's continued supervision of the School District. The Court also provided the public with an opportunity to submit written objections and held a hearing at which members of the public were invited to voice their opinions and concerns on the matter. The parties, after reviewing the relevant data and conferring with their class representatives, have reached an agreement by which the Plaintiffs have withdrawn any objection to a declaration of full unitary status while ensuring that students will continue to be able to utilize the M-to-M program under the terms set forth later in this order. All parties

now agree as a matter of fact and law that the School District is presently a unitary School District devoid of any present vestiges of de jure segregation that once racially segregated the School District's schools prior to this Court's desegregation orders. The parties agree that the School District's unitary status is supported by this Court's findings of fact and conclusions of law over the forty-plus years this case has been pending. The following summary of those findings of fact, conclusions of law and stipulations of fact demonstrate that the School District is in fact unitary in every respect and specifically relating to the six factors identified in Green v County School Bd. of New Kent County, Virginia, 391 U.S. 430, 435 (1968), as the principal benchmarks for a unitary status determination: (A) student assignment; (B) faculty; (C) staff; (D) transportation; (E) extra curricular activities; and (F) facilities.

## FINDING OF FACTS AND CONCLUSIONS OF LAW

The parties stipulate to and the Court finds the following:

1. The School District is unitary regarding all Green factors for which this Court found the Constitution had been violated.

2. There are no remnants of past de jure discrimination that remain in the school system that could practicably be eliminated, and the racial imbalances in some schools raised as a concern by some members of the public are not the result of present or past discrimination on the School District's part.

3. The School District has complied in good faith with the Court's existing

desegregation orders since those orders have been entered.

**(A) Student Assignment**

4. The Court found in its August 16, 1971 Order, and all parties agreed, that the public high schools and middle schools in Bibb County were desegregated.

5. The School District has engaged in no intentional discrimination with respect to the assignment of students to the middle and high schools since that time.

6. The School District's thirty years of compliance with the Constitution severs any conceivable link between current racial imbalances in these schools and the de jure system.

7. On September 5, 1978, the Court found the parties consented to a desegregation plan for the elementary schools and that student assignments in those schools were compliant with the Constitution.

8. The Court found and the parties stipulated on April 6, 1984 that further integration of the elementary schools was no longer an issue in the case. The Eleventh Circuit affirmed this finding.

9. Since that stipulated finding, the School District has not engaged in any intentional discriminatory conduct regarding the assignment of students to the elementary schools and has complied with all applicable orders concerning elementary school assignments in good faith.

10. The parties have not identified any link between racial imbalance in

elementary school assignments and the de jure segregation in the assignment of elementary school students is entirely severed today. Accordingly, all parties to this litigation having conceded that the School District has achieved maximum practicable desegregation of its schools and, given the absence of any complaints of intentional resegregation, the School District is unitary with regard to student assignment.

**(B) Faculty and (C) Staff**

11. The parties stipulated and this Court found on September 1, 1971 that the School District was completely desegregated with respect to the assignment of faculty and staff.

12. Since that time the School District has not engaged in intentional discrimination with regard to faculty and staff assignment and has complied with all applicable orders in this regard in good faith.

13. There are no links between any present day racial imbalances regarding faculty and staff assignment and all vestiges of past discrimination have been eliminated to the extent practicable.

14. The School District is unitary with regard to faculty and staff assignment.

**(D) Transportation**

15. On September 1, 1971, this Court found the School District was "completely desegregated" in the area of equality of transportation.

16. Since that time, the School District has complied with all applicable orders regarding equality in transportation, has not engaged in intentional discrimination and has eradicated all vestiges of past discrimination to the extent practicable in the transportation of students.

17. The School District is unitary with regard to the transportation of students.

**(E) Extracurricular Activities**

18. The court determined also that the School District was completely desegregated in the area of extracurricular activities on September 1, 1971.

19. The School District has not engaged in intentional discrimination in the area of extracurricular activities and has complied with all applicable orders in that regard and has eradicated all vestiges of past discrimination respecting extracurricular activities to the extent practicable.

20. The School District is unitary with regard to extracurricular activities.

**(F) Facilities**

21. This Court made no findings of past discrimination on the issue of facilities or any other <u>Green</u> factors. The Consent Decree of June 30, 1978 (and the Court's Order of September 5, 1978) placed decisions regarding school construction, consolidation and attendance zones within the School District's discretion, requiring only that such changes be executed in a manner that would prevent the recurrence of the dual school structure and effectuate the

continued existence of a unitary School District. The Consent Decree also set forth certain requirements with respect to inner-city schools. While there is some concern regarding the impact of facilities plans executed in recent years, the Plaintiffs did not object to any of these at the time; nor have they alleged that the School District has engaged in intentional discrimination on facilities.

22. The School District is unitary with regard to facilities.

## THE M-TO-M PROGRAM

In December of 2004, the Garrett Plaintiffs (the Caucasian Plaintiff class) filed a motion seeking to modify the Consent Decree. The result was a mediated agreement through which the parties agreed, inter alia, that the M-to-M program would be limited by requiring the School District to deny M-to-M transfers as well as other transfers where the effect was to exceed student capacity limitations for those schools capable of receiving M-to-M transfers. This agreement and the resulting Order impacted mostly elementary schools. The School District has complied in good faith with the terms of this mediated agreement. The parties consent to a judgment of unitary status was designed to bring this case to a close while ensuring that students will continue to be able to utilize the M-to-M transfer program for a designated period of time. In consideration of an agreement by the Adams Plaintiffs (the African-American Plaintiff class) to withdraw any objections to a declaration of full unitary status in this case, the parties agreed to the following terms regarding continued operation of the School District's M-to-M program, and these terms are

hereby incorporated and made part of this Order:

1. The School District shall continue to administer the M-to-M transfer program for an additional two (2) application cycles, in the Spring of 2007 and the Spring of 2008, under the guidelines set forth in the Court's March 21, 2006 Order regarding student transfers. The last round of new M-to-M transfers will be granted in 2008 and will take effect during the 2008-2009 school year.

2. The March 21, 2006 Order, incorporated herein by reference, shall govern all M-to-M transfers. In accordance with the provisions of that Order, students who have been granted M-to-M transfers as of the commencement of the 2008-09 school year will be permitted to complete the terminal grade at the school they are then attending.

3. Beyond the Spring 2008 deadline for transfer applications, the School District will no longer be obligated to continue accepting applications for the M-to-M transfer program.

4. The School District will continue to file with the Court and provide to all parties Annual Reports through October 15, 2008. These reports shall include information relevant to the types of transfers authorized under the March 21, 2006 Order.

5. Any party may seek to enforce the above-stated terms upon appropriate motion to the federal District Court.

## TERMINATION OF COURT SUPERVISION

Based on the foregoing, and upon the representations of the parties, the Bibb County School District is hereby declared a unitary system in all legally material respects. Judicial supervision of the School District is hereby terminated.

## ATTORNEY'S FEES

The issue of attorney's fees has been resolved by settlement among the parties as shown in the attached exhibit.

**SO ORDERED this 20th day of March, 2007.**

**S/**
**Wilbur D. Owens, Jr.**
**United States District Court Judge**